PORTER et al. v. TONOPAH NORTH STAR TUNNEL & DEVELOP-
MENT CO.

(Circuit Court, D. Nevada.  November 28, 1904.)

No. 771.

1. MINING CLAIMS—CONFLICTING LOCATIONS—PRIORITY OF RIGHT.
   So long as a prior location of a mining claim is subsisting, no rights
   in any of the ground covered by such claim can be acquired by a junior
   locator.

2. SAME—AMENDED CERTIFICATE OF LOCATION—NEVADA STATUTE.
   Cutting's Comp. Ann. Laws Nev. §§ 210, 213, were enacted for the
   benefit of locators of mining claims, giving them 90 days to perfect
   their location, to cure defects, if any existed, in the original notice or
   the marking of the boundaries, mistakes in the directions and courses,
   etc.  Such statute does not require the filing of an amended certificate of
   location where the original notice is clear, definite, and certain, and the
   boundaries of the claim so marked and monumented that they can be
   readily traced and determined, in which case such notice may be filed
   and recorded as a certificate of location.

3. SAME—CONFLICTING CLAIMS—EVIDENCE CONSIDERED.
   Evidence considered, and held insufficient to sustain the burden of
   proof resting on adverse claimants to show that any part of mining
   ground sought to be patented by defendant was within the boundaries
   of a claim as previously located by plaintiffs and their grantors.

Suit in Support of an Adverse Claim to Mining Property.

Garoutte & Goodwin, for complainants.

Campbell, Metson & Campbell and Key Pittman, for defendant.

HAWLEY, District Judge (orally).  This is a suit or proceeding
brought in support of an adverse claim and protest filed by the complain-
ants in the United States Land Office at Carson City, Nev., against the
application of the defendant for a patent to certain mining ground
situated in Tonopah, Nye county, Nev., to determine which of the
parties has the better right to the mining ground in controversy.  The
right and interest of the complainants to the land is based upon a
location of a mining claim known as the "Dave Lewis Hope," and the
amended certificate of location of said claim under the name of the
"Mizpah Intersection"; and the right and interest of the defendant to
the ground is based upon a location of a mining claim known as the
"Ivanpah."  The Dave Lewis Hope claim was located August 26,
1901, by Dave R. Lewis and Charles J. Carr.  The notice of location
reads as follows:

"Location Notice Dave Lewis Hope.  Notice is hereby given that the under-
signed has this day located fifteen hundred linear feet on this vein or lode,
supposed to run in an Northwest and South E. direction with three hundred
feet on each side of the vein.  Commencing at this monument and running one
thousand feet in a Southeasterly direction, and five hundred feet in a North-
westerly direction.  This mine is situated in the hill or mountain east of the
group of mines known as the Tonopah mines owned by J. Butler and Co.
This mine shall be known as the Dave Lewis Hope.  Situated in Tonopah
Mining District, Nye Co. Nevada.  Dated Aug. 26, 1901.  Locators.  Dave R.
Lewis, Chas. J. Carr."

¶ 1. See Mines and Minerals, vol. 34, Cent. Dig. §§ 65, 68.

. This notice was recorded in the county recorder's office September 2, 1901.   The amended and additional certificate of location of the Dave Lewis Hope, under the name of the "Mizpah Intersection," was made May 17, 1902, by Jerome P. Porter, and reads as follows:

"Additional and Amended Certificate of Location. Know all men by these presents that the undersigned Jerome P. Porter, a citizen of the United States, has this 17th day of May, 1902, amended, located and claimed, and by these presents does amend, locate and claim by the rights of the original discovery. and the location heretofore made such deeds, transfers or conveyances as may have been made, and this amended certificate made, filed and recorded as provided by Federal law and by the laws of the State of Nevada now in force, and local customs and rules fifteen hundred linear feet, on this lode, vein, ledge or deposit, bearing gold, silver, lead, copper and other valuable minerals, with all its dips, angles, and variations as allowed by law, together with three hundred feet on each side of the middle of said vein at the surface and all veins, lodes, ledges or deposits and surface ground within the lines of said claim. This said lode was originally located by D. R. Lewis and Chas. J. Carr on the 26th day of August, 1901, and named the Dave Lewis Hope, by which name it is found of record in Book E. of Mining Locations pages 123 and 124, Nye County, Nevada Records. It is also found in Book B. page 119 Records of Tonopah Mining District said County and State. The name of this lode in future will be the Mizpah Intersection, the date of this amended location is made the 17th day of May, 1902. The name of the amending locator is Jerome P. Porter. From the discovery point at the discovery monument there is claimed by me one thousand feet in a Southeasterly direction and five hundred feet in a Northwesterly direction, along the course of said lode or vein. The general course of this vein is North 8° West by South 8° East. The discovery shaft or its equivalent is situated upon the claim eight hundred feet South from the North end center and exposes the ledge at a depth of fully ten feet; its dimensions are 5 by 8 by 10 feet deep. This further additional and amended certificate of location is made and filed without waiver of any previously acquired and existing rights in and to said mining claim, but for the purpose of correcting any errors or omissions in the original location, or location certificate, description or record; and for the purpose of securing the benefits of the Act of the Legislature of the State of Nevada. Approved March 16th, 1897, and the amendments thereto, and of conforming to the requirements of law. The amending locator hereto is the original locator or lawful grantee deriving title and right of possession from them by deed of conveyance. [Then follows a description of the location by metes and bounds.] Locator. Jerome P. Porter."

In this amended notice there are several interlineations and changes, and there was more or less controversy as to who made the same.   This is especially true as to the erasure of the word "shaft" and substitution of the word "monument."   There was also another amended and additional certificate of location in pencil, and with more or less interlineations, that was left by Dr. Porter with the recorder.   The notices, however, are substantially the same.

The notice of location of the "Ivanpah" by F. M. Ish, of date October 10, 1901, is as follows:

"Certificate of Location. State of Nevada, Nye Co. Know all men by these presents that I, F. M. Ish, have this 10 day of Oct. 1901, located 1500 ft. linear ft. on the Ivanpah lode or vein or deposit, together with 300 ft. on each side of the middle of the vein 700 ft. running southerly and 800 ft. northerly from center of discovery monument. Situated Tonopah Mining District, Nye Co. State of Nevada, to wit, the south end of this claim adjoins the north side line of the Mizpah mine and crosses a portion of the east end of the Lucky Jim —is situated on the west and northwest slope of the high hill northeast of the town of Tonopah, known as the Oddie Peak."

This notice was recorded in the office of the district recorder, and in the office of the county recorder, January 8, 1902. There was but one location notice. As posted on the ground it was called "Notice of Location," and when recorded it was called "Certificate of Location."

It will be observed that the Dave Lewis Hope mining claim was prior in point of time to the other claims, and if it included any portion of the ground within the Ivanpah location, and if the law was complied with by the owners of the Dave Lewis Hope as to the work and labor to be done thereon, then it would necessarily follow that a decree should be rendered in favor of complainants. Because "mining claims are not open to relocation until the rights of a former locator have come to an end," two locations cannot legally occupy the same space at the same time. However regular in form a junior location might be, it is of no effect as against the rights conferred upon the prior locator, so long as the prior location is subsisting. These principles were announced by the Supreme Court in Belk v. Meagher, 104 U. S. 279, 284, 26 L. Ed. 735, in 1881, and repeated in numerous decisions, including Del Monte M. Co. v. Last Chance M. Co., 171 U. S. 55, 79, 18 Sup. Ct. 895, 43 L. Ed. 72, decided in 1897, and have always been followed by the national courts, and are too well settled to require discussion.

The testimony on behalf of the complainants as to the place where the discovery monument of the Dave Lewis Hope was erected, and as to where the notice was posted, taking the directions and distances mentioned in the notice, would so locate the land as to include a portion of the ground embraced in the Ivanpah location. On the other hand, under the testimony of the defendants, the discovery monument, with the notice thereon, of the Dave Lewis Hope, would locate the ground entirely without the premises covered by the Ivanpah location, and would not include the cut claimed to have been made by the locators of the Dave Lewis Hope. Upon these points, as well as others, the testimony is more or less conflicting, and, in many respects, unsatisfactory. There is more or less uncertainty in the testimony upon all the controlling questions of fact involved in this case.

With reference to the location of the claim and discovery monument on the Dave Lewis Hope, Carr testified that he and Lewis put up nine stakes and monuments on the different lines and courses of the claim, giving the distances and directions, and that the first one that he built was "about 45 or 50 feet" north of "the present shaft where the North Star tunnel is worked"; that this stake "was placed in rocks, and a 3 by 4 scantling in it." This was his starting point. "Our location work was here. * * * I put one notice the first day from the location ground on the vein." At all the corners he placed notices in cans, "describing what corners and what directions they were in."

Caper, at Carr's request, in the month of October, 1901, went up on Oddie mountain and stayed there about one hour. He testified that he knew where the North Star hoisting works are now—

"But I have never been up there. Q. Where did you go with Mr. Carr on that ground with reference to that shaft or those hoisting works? A. Well, I don't know exactly; it is close there, somewhere on the side of the hill. * * * Q. What did you see there? A. I see they had a cut there. * * * Q. Describe that cut to the court. A. There was a cut, I think, about 15 feet long, and the face was about 10 feet. * * * Q. How wide was it? A. About

4 to 4½ feet. * * * Q. Did you see any monument or stake around there anywhere? A. I see the monument a few feet above his cut up there. * * * Q. How close to the cut? A. Three or four feet; somewhere there. Q. Was there any notice there at that monument? A. He had some paper out of the can, and he read it. I was on the cut at that time, and when I went in there I see his name and Lewis' on the paper."

As to the work done upon the claim, Carr testified that, about 8, 10, or 12 days after they had put up their monuments, they commenced work right alongside of the location.

"We made a cut of three lengths of the shovel; the shovel measures five feet; and that made 15 feet, and from 4½ to 5 feet wide. Q. How deep was that cut at the face? * * * With reference to your height? A. Well, it was a little over my reach. * * * Q. State to the court when this work that you have described was completed. * * * A. I guess we were about from 35 to 40 days doing it. * * * Thirty-five or thirty-eight or forty days, something like that; long before the required time, anyhow. We had 90 days."

Dr. Porter testified that he first went to Tonopah in the month of November, 1901; that he saw a cut near the present North Star shaft, but paid no particular attention to it at that time; that in the latter part of April, 1902, he went upon the ground with Dave Lewis, and the cut "was still there"; that about the middle of May, having previously obtained a bond on the claim, he enlarged the cut. "The cut then was 4½ feet wide, and I enlarged it to about 14 feet wide, and cut a large adit in the hill. * * * Sunk a prospecting shaft 5 by 8 in the clear" on the vein which was exposed by the cut. In all, he performed over $100 worth of work on the cut. He also testified that he had, and introduced, a photograph showing the cut as it existed prior to his doing any work thereon, and also another photograph taken after he finished his work. He then testified as to what steps were taken by him on May 17, 1902. On his cross-examination, in describing the posts and monuments, he was asked:

"Q. Did you see any location monument there? A. No, sir. Q. All that you saw then were eight monuments? A. Yes."

He then described the monuments as they appeared to him in April, 1902, when he went back there. At another time, when testifying about the attachment papers:

"Q. I am asking you about point No. 1 on the Carr diagram. Was there a monument at that point on the Dave Lewis Hope claim? A. I did not see one there."

On behalf of defendant, Frank M. Ish testified that prior to October 10, 1901, the date of the Ivanpah location, he examined the ground, and went over the hill to ascertain where there was vacant ground. Among other things, he said:

"In looking this ground over, I went to every monument that was on that hill that could be seen, commencing at the north end of the Mizpah, or the east end of the Mizpah, and going across the ground in a northwesterly direction, and whatever ground was vacant to the left of what I thought to be the Silver Star location. * * * I examined all of the monuments that I could see, of whatever nature or description, was on that ground, and I found in my investigations, up near the top of Mount Oddie, I found the location post, discovery post, of the Dave Lewis Hope claim. I found a monument probably.

20 inches high, possibly two feet and a half across. * * * A small monument of rock, and in that monument a small can—a baking-powder can or something of that kind, I think—with a removable top, and I took out and read the notice. This notice then claimed, if my recollection serves me right, 500 feet northwesterly, and 1,000 feet southeasterly, or northerly and southerly. * * * I am not exactly positive of that, more than it was, I think, northerly or northwesterly, and southeasterly. Knowing the latitude that prospectors take to get the directions and locations of a claim, I sought to the north for space that would indicate where his lines were, and I found none. I then went to the south again, and examined all the ground along on the line of the Mizpah, or about that point, which would take it about the required distance, and I found none there. There were no side monuments that I could find, and, not knowing further about his ground, I located the Ivanpah."

After giving a description of how he made the Ivanpah location, where his posts and monuments were placed, etc., upon which there is no controversy, he testified, in answer to questions, as follows:

"Q. State whether or not there was any excavation in the nature of a cut on that ground in October, 1901, when you went there. A. No, sir; there was absolutely not a breaking of the surface, not a pick point, that was visible for a distance of a hundred feet anywhere within the confines of what was then located as the Ivanpah claim."

He was asked whether any work was done by him on the Ivanpah:

"A. Yes, sir; I did not do the work myself, but I empoyed Mr. L. O. Ray. He subsequently did the work; he did it, about the 1st of December, by driving a cut into the hill, which exposed the vein at a depth of 10 feet. Q. Was any work done within the limits of the Ivanpah claim subsequent to October 8 or 9, 1901, other than this work? A. No, sir; there was none done, not a particle. Q. Now, as to 1902, was there any work done within the Ivanpah by any one? A. Yes, some time in the month of February. * * * I don't know the date. I at that time had charge of a property at a place called Weepah, out at Lone Mountain, and, employing a number of men, it was necessary for me to go into town very often; that is, quite often, sometimes once a week, sometimes once in two weeks, or oftener. I do not remember the dates, but on returning from one of these trips I saw that an excavation had been made on the side of the mountain at a point where, very near where, the present location of the North Star shaft is. It was new, and I discovered it, as I say, from a long distance. The breaking of the surface of that hill you can see for long distances. It was plainly visible from the town."

His attention was called to a diagram made by Mr. Carr, and he was asked the question:

"Assuming that the white lines as made by Mr. Carr are the lines of the Dave Lewis Hope claim, where would the dump made when you were going back and forth to Weepah be—inside of those white lines, or outside of them? * * * A. I believe it would be clear outside of their lines. Q. About how many feet would it be from the point where you found the Carr notice?"

And, after specifying certain figures marked on the diagram, he was asked:

"Using that as a starting point, how far outside or inside of the westerly side line of the Dave Lewis Hope claim would that dump be? A. It would be well without it."

In the course of his testimony:

"Q. Was there a smaller cut at the place where you say you saw this work done in February? Was there a small cut prior to February at that place? A. No, sir. Q. Could it have been there and you not have seen it? A. No, sir;

it could not have been there and I not have seen it.  *  *  *  Q. You have heard Mr. Carr testify that in August of 1901 he put up nine large monuments there on that ground, and put tin cans in each of them, and stakes in each of them.  I will ask you whether or not at any time in 1901 you saw any monuments or stakes of the kind or character at the place described by Mr. Carr, except the one where you found the notice of location?  A. No, sir; I never saw them, and I know, further, that if they had existed I could not have helped but seen them."

There were eight other witnesses on behalf of the defendant who testified to seeing the location monument and notice of location at or near the point testified to by Mr. Ish, and several of them testified as to the examination of the ground and finding no posts or monuments on the lines testified to by Mr. Carr previous to the time when Porter made his amended location, and many reasons are given tending to show that the witnesses could not be mistaken.  They vary somewhat as to the distance of the location monument from the work in the cut near the North Star shaft, most of them placing it up on top of the hog's back "near the apex of Mount Oddie."

Nine witnesses besides Ish testified that there was no work done by anybody at the point testified to by Carr near the North Star shaft until the month of February, 1902.  The testimony upon this point is clear, direct, positive, and convincing in its character.  It seems unreasonable to believe that the witnesses could have been misled or mistaken.

A brief reference to the record will indicate with sufficient clearness the general character of this testimony.  Ray, a stockholder in the defendant corporation, was familiar with the location.  He testified that the first time he saw the cut was "about the 15th of February, 1902"; that he lived at Ray, and frequently visited Tonopah; that "the trail I went over time and again in December went right to the side, not more than three feet from where that cut was placed afterwards"; that there "never was any cut in that mountain during the month of December, 1901, or any time previous to that"; that he was over the ground four or five times during the month of January. Curtis, a wholly disinterested witness, testified that there was no cut or excavation within a radius of 200 feet from where the North Star shaft now is, when he visited the place in November, 1901.  The testimony of Oddie and several other disinterested witnesses is substantially to the same effect.

Ramsey testified that he was on the ground with Curtis and Salsberry, and that there was no cut or excavation at that place.

"Q. How do you know?  A. Well, I know because we were right in the particular spot; sat down there for a while; probably half an hour we sat there and talked—Mr. Curtis, Mr. Salsberry, and myself.  Q. Was there any digging or use of a pick there at that time?  A. I didn't notice any digging at all.  Q. Did any of your party do any digging there at that time?  A. I did a little digging with a pick; went around and made a little hole a few inches deep. Q. What were you digging on, if anything?  A. We were sitting on the ground there, and a kind of streak ran down there; I dug down and dug out some black-looking stuff—manganese."

The testimony of John McCune, a typical pioneer mining prospector, is very strong.  He knew Dave Lewis, and at one time worked three shifts for him on the Dave Lewis Hope claim along about the 1st of February, 1902.  The work consisted of a crosscut, "an open cut,"

near where the North Star shaft is now; "wasn't very far from it sure. Q. Who paid you for that work? A. Dave Lewis." He used powder and steel procured from Davis & Lothrop. Dave Lewis showed him the location monument.

"It was up on a ridge * * * a little bit west of north from where we done the work. Q. About how far north would you figure it? * * * A. I didn't have any compass for that. Q. How far would you guess it to be? A. Well, I would guess it probably 300 feet—some place in that neighborhood. * * * Q. When you went up to do this work, was there any cut where you started this cut in? A. There was a little work there, not anything to speak of. * * * You could not call it work; it was just enough to show that somebody had been on the ground, I guess. Q. Been scratching there? A. Well, that is all it was. * * * I could not call it location work at all. * * * Oh, it was just enough to show that there was somebody there; it was kind of drawn, or shoveled, the dirt, or I don't know whether they had a shovel at all or not."

It appears from the record that Dave Lewis before his death made a confidant of Mr. Davis, a merchant in Tonopah; deposited his money with him, when he had any; traded with him; and often talked about his property, and of the Dave Lewis Hope claim. The books kept at the store of Davis & Lothrop show the purchase of the materials furnished McCune, at the request of Lewis, at the time mentioned. In April or May, 1902, having heard much talk about the Dave Lewis Hope, Davis, in the interest of Lewis, and Mr. Harris, the secretary of the defendant, made an engagement with Lewis, and met him on the ground with the avowed purpose of having him show them where the ground was, and what work had been done upon it, etc. Much of the testimony of these witnesses consisted of statements and declarations made by Lewis which will only be considered as leading up to the facts testified to by the witnesses. Lewis showed them, among other things, the cut at the point near the North Star shaft, and told them the work was done in February, 1902. He also pointed out to them the location monument of the Dave Lewis Hope, about 300 feet northerly up the hill from the cut where he claimed he had done some work. They went to this monument, examined the ground thoroughly all around the vicinity, and found nothing to show that any work had ever been done there.

Eleven witnesses, men of prominence and good standing in Tonopah, and nearly all of them wholly disinterested, testified that they were well acquainted with the general reputation of Charles J. Carr in the community as to truth, honesty, and integrity, and that it was bad.

The mere contradiction of a witness does not necessarily warrant the court in disregarding the whole of his testimony for want of corroboration, but the contradiction may be such as tends to weaken, if not entirely destroy, the force and effect of his testimony. A witness may also be directly impeached by proof that his general reputation for truth, honesty, and integrity in the community where he resides is bad.

The burden of proof to establish the validity of the Dave Lewis Hope claim, and that it included some portion of the ground embraced within the boundaries of the Ivanpah location, was upon complainants. They failed to establish these facts by a preponderance of evidence to the satisfaction of the court. There was no amended location made to the

Dave Lewis Hope until long after the 90 days had expired within which time it may be conceded, for the purpose of this case, that an amended notice of the Dave Lewis Hope claim might have been made so as to include a portion of the Ivanpah location. The original location was made August 26, 1901; the amended location by Porter was not made until May 17, 1902, over eight months after the original location was made, and long subsequent to the date of the location of the Ivanpah claim. This amended location, in so far as it covers any portion of the Ivanpah location, in the light of all the facts, is subsequent in time to the rights acquired by the Ivanpah claim. If the amended certificate of location of the Dave Lewis Hope claim had been made and recorded within the 90 days provided by the statute, or at any time thereafter before the Ivanpah was located, then it might be claimed that the record notice thereof would have been prima facie evidence of its own sufficiency, as provided by the statute of Nevada. But, as is said in 1 Lind. on Mines (2d Ed.) § 393:

"The real purpose of the record is to operate as constructive notice of the fact of an asserted claim and its extent. When the locator's right is challenged, he should be compelled to establish by proof outside of the certificate all the essential facts, without the existence of which the certificate possesses no potential validity."

And further adds:

"These facts once proved, the recorded certificate may be considered as prima facie evidence of such other facts as are required to be stated therein."

After a careful examination and consideration of all the relevant testimony contained in the record, I am clearly of the opinion that the decided weight of the evidence shows that on the 10th day of October, 1901, the ground then located by Ish as the Ivanpah was vacant, public mineral land, subject to location; that the Ivanpah was a valid location; that the locator and owners thereof have fully complied with the law, and have the better right and title to the ground covered by such location.

The fact that no amended location of the Ivanpah ground was made within the 90 days after the location, cannot be taken advantage of by the complainants under the facts of this case. I do not understand the law to be, in cases where the original notice is clear, definite, and certain, and the boundaries of the claim so marked and monumented that the same can be readily traced and determined, that it is necessary for the locator thereof to file an amended certificate of location, as required by sections 210 and 213, Cutting's Comp. Ann. Laws, Nev. That statute was passed for the benefit of the locators, giving them 90 days to perfect their location, to cure defects, if any existed, in the original notice or the marking of the boundaries, mistakes in the directions and courses, etc. The certificate of location and amended certificates may always be made within the 90 days so as to allow the discoverer "to rectify and readjust his lines whenever from any cause he desires to do so, provided he does not interfere with or impair the intervening rights of others." But if the locator is satisfied with his original notice, he can file the same within 90 days, and can call it his certificate of location. The object of the statutes of Nevada, touching this matter, was fully discussed and stated by this court in Tonopah & Salt Lake M. Co.

v. Tonopah M. Co., 125 Fed. 389, 396, and the principles there announced are applicable to this case, and fully support the views I have expressed.

The defendant proved all the necessary facts entitling it to a patent. Let a decree be entered in favor of the defendant, with costs.